# IN THE SUPREME COURT OF PENNSYLVANIA
## MIDDLE DISTRICT

### SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, BY JOSH SHAPIRO, ATTORNEY GENERAL; PENNSYLVANIA DEPARTMENT OF INSURANCE, BY JESSICA K. ALTMAN, INSURANCE COMMISSIONER AND PENNSYLVANIA DEPARTMENT OF HEALTH, BY RACHEL LEVINE, ACTING SECRETARY OF HEALTH<br><br>v.<br><br>UPMC, A NONPROFIT CORP.; UPE, A/K/A HIGHMARK HEALTH, A NONPROFIT CORP. AND HIGHMARK, INC., A NONPROFIT CORP.<br><br>APPEAL OF: UPMC, A NONPROFIT CORP. | : No. 5 MAP 2018<br>:<br>: Appeal from the Order of the<br>: Commonwealth Court at No. 334 MD<br>: 2014 dated 1/29/18<br>:<br>:<br>:<br>:<br>: ARGUED: May 16, 2018<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: |

## OPINION

**CHIEF JUSTICE SAYLOR**                     **DECIDED: July 18, 2018**

This case is a continuation of a longstanding dispute between a leading healthcare insurer and a major health services provider operating in Western Pennsylvania.

By way of background, UPE, a/k/a Highmark Health and Highmark, Inc. (collectively, "Highmark"), and UPMC separately entered into Consent Decrees with the

Commonwealth's Office of Attorney General ("OAG").[1] The present controversy centers on the obligations imposed by the Consent Decrees relative to UPMC's attempt to terminate ten hospital Medicare Acute Care Provider Agreements ("Provider Agreements") that it has with Highmark.

Pertinent to this matter, UPMC's Consent Decree requires it to treat Highmark's Medicare Advantage Plan ("MA Plan") consumers as in-network through the end date of the Consent Decree, June 30, 2019.[2] That mandate derives from the "Vulnerable Populations" provision of the Consent Decree, which provides as follows:

> **2. Vulnerable Populations**—[1] UPMC and Highmark mutually agree that vulnerable populations include: (i) consumers age 65 or older who are eligible or covered by Medicare, Medicare Advantage, (ii) Medigap health plans, (iii) Medicaid and/or (iv) CHIP. [2] With respect to Highmark's covered vulnerable populations, UPMC shall continue to contract with Highmark at in-network rates for all of its hospital, physician and appropriate continuity of care services for CHIP, Highmark Signature 65, Medigap and commercial retiree carve out as long as Highmark does not make unilateral material changes to these programs. [3] UPMC shall treat all Medicare participating consumers as In–Network regardless of whether they have Medicare as their primary or secondary insurance. [4] UPMC reserves the right to withdraw from these arrangements if Highmark should take the position that it has the authority to revise the rates and fees payable under those arrangements unilaterally and materially.

Consent Decree §IV(A)(2).[3]

---

[1] For a more detailed recitation of the circumstances leading to the Consent Decrees, see *Commonwealth ex. rel. Kane v. UPMC*, 634 Pa. 97, 129 A.3d 441 (Pa. 2015).

[2] Although there are two separate Consent Decrees, signed by UPMC and Highmark respectively, that are identical in all material respects, further references herein will be to the singular "Consent Decree" as both a stylistic matter and reflecting that it is the enforcement of only the agreement signed by UPMC that is at issue.

[3] Following the convention employed in *Kane*, each sentence of this provision has been given a number and is referenced as "VP-1," "VP-2," etc.

In a previous dispute between these parties regarding the Consent Decree, *see Commonwealth ex. rel. Kane v. UPMC*, 634 Pa. 97, 129 A.3d 441 (Pa. 2015) (hereinafter, "*Kane*"), this Court held that VP-3 "obliges UPMC to treat those participants in Highmark [MA Plans] as 'In-Network,' and, thus, requires it to have a contract with Highmark that establishes negotiated rates for treatment of those in [MA Plans] for which Highmark currently has provider contracts with UPMC." *Id*. at 143-44, 129 A.3d at 469. The Court reasoned that, although MA Plans were not mentioned in VP-2, which requires UPMC to "continue to contract," and VP-3 did not contain identical language, the mandate to treat Medicare participants as "In-Network" indicated an on-going contractual relationship. *Id*. at 141, 129 A.3d at 467 (quoting Consent Decree §II(I) (defining "In-Network" as "contracted . . . to provide specified services for reimbursement at a negotiated rate")). The Court also buttressed its view with the broader perspective that the Consent Decree was developed to protect the vulnerable populations outlined in VP-1.[4] Additionally, although the Court explained that VP-3 of the Consent Decree did not require automatic annual renewal of the preexisting Provider Agreements, it observed that UPMC's obligation to provide in-network access to its facilities may be accomplished by such renewals or some alternative agreement that ensured access.

Following *Kane*, UPMC allowed the Provider Agreements with Highmark to renew annually in satisfaction of its in-network obligation.[5] Of relevance here, those

---

[4] Pertinent to the present controversy, one of the primary motivations for the Consent Decree was the protection of vulnerable populations from the consequences of the sudden and then-impending loss of UPMC as a provider to Highmark's customers. *See Kane*, 634 Pa. at 105, 129 A.3d at 445-46.

[5] Subsequent to the *Kane* decision, Highmark developed and marketed an MA Plan that completely excluded UPMC as an in-network provider. *See* Highmark's Answer to the Petition to Enforce ¶46.

agreements, which pertain exclusively to Medicare consumers, establish the terms for the provision and payment of healthcare services for Highmark's MA Plan subscribers at UPMC facilities. They also permit one-calendar-year renewals, which align with the calendar year that all Medicare Advantage plans employ, including Highmark's MA Plans. However, the Provider Agreements allow UPMC to terminate the annual renewal via timely notice. Upon termination of the agreements, Section 16.3, referred to as the "runout" provision, requires UPMC to continue to abide by the same terms and conditions of the Provider Agreement for six months following the end of the final annual renewal period.[6]

Turning to the present controversy, on September 26, 2017, UPMC informed Highmark, in accordance with the notice provisions, that it would terminate the Provider Agreements on December 31, 2018, but would, nonetheless, continue to comply with all terms and obligations of those agreements through June 30, 2019, pursuant to the runout provision. Highmark responded the next day by filing a motion for an expedited

---

[6] Section 16.3 of the Provider Agreements provides, as follows:

> In the event of termination of this Agreement for any reason other than default by [UPMC], [UPMC] shall be obligated to continue to comply with the terms and conditions of this Agreement and continue to provide services to [Highmark's] Members for six (6) months after the date on which the termination becomes effective. For services rendered during this six (6) month period, [UPMC] shall accept [Highmark's] Plan's rates in effect on the termination date.
>
> In addition to the rights stated herein, the non-defaulting party shall have any and all remedies otherwise available at law or in equity, including, without limitation, specific performance.

Provider Agreement §16.3 (alterations added). This clause was added to the Provider Agreements by amendment dated January 4, 2002.

special injunction and contempt with the Commonwealth Court.[7] Highmark asserted that UPMC's termination of the Provider Agreements violated its obligation to continue to contract for vulnerable population services for the full period of the Consent Decree. Ultimately, Highmark withdrew its motion, but OAG, representing the interests of the Commonwealth and aligning with Highmark's position, filed a Petition to Enforce.[8] OAG asserted that UPMC's proposed termination of the Provider Agreements and reliance on the runout provision failed to comply with the terms of the Consent Decrees. Thus, it sought an order requiring UPMC to continue to contract with Highmark.

Thereafter, Senior Judge Pellegrini held a hearing at which no evidence was taken, since the parties agreed that the case hinged solely on a legal determination of the meaning of the text of the Consent Decree and Provider Agreements.[9] UPMC argued that it was permitted to terminate the Provider Agreements and that, in accord with the runout provision, it would continue to provide in-network access to its facilities until the end of the Consent Decree on June 30, 2019, thus satisfying its obligation. OAG disagreed, contending that the Provider Agreements could not be terminated until June 30, 2019, and that the runout provision did not constitute a continuation of the contractual relationship. Further, since the Provider Agreements renew annually on a

---

[7] The Commonwealth Court, by the terms of the Consent Decree, retains jurisdiction for any necessary and appropriate interpretation, modification, or enforcement. *See* Consent Decree §IV(C)(11).

[8] The Pennsylvania Departments of Insurance and Health, although named parties here and involved with negotiating aspects of Highmark and UPMC's relationship, have chosen not to take any position in this matter.

[9] Although no evidence was taken, the parties submitted a voluminous record for the court to review, including, *inter alia*, the testimony from the *Kane* case, affidavits supporting and responding to OAG's Petition to Enforce, and attachments to the affidavits that reflected advertising and relevant federal rules and regulations. These documents constitute the present reproduced record.

calendar basis, OAG asserted that they must be maintained through 2019. Consequently, OAG posited that UPMC could only terminate the agreements on December 31, 2019, in turn making the runout provision operative through June 30, 2020. Highmark joined OAG's view.[10]

In an order filed January 29, 2018, the Commonwealth Court granted OAG's Petition to Enforce. In the accompanying unpublished opinion, Judge Pellegrini began by noting that the Consent Decree was designed to "lessen the anxiety of Highmark subscribers by providing certainty as to what would occur during transitional periods," as well as offering them the opportunity to make informed decisions. *Commonwealth v. UPMC*, No. 334 M.D. 2014, at 2-3 (Pa. Cmwlth. filed Jan. 29, 2018) (single-judge opinion). As to the dispute in this case, the court framed it as centering on "what is meant by UPMC's obligation [under VP-2 of the Consent Decree] to 'continue to contract' with Highmark until June 30, 2019, to provide in-network access to Highmark MA Plan subscribers." *Id.* at 5 (quoting Consent Decree §IV(A)(2)). The court deemed the Provider Agreements between UPMC and Highmark as the contracts referenced by the "continue to contract" language.

Acknowledging that interpretation of the Consent Decree required application of general contract precepts, *see Int'l Org. Master, Mates & Pilots of Am., Local No. 2 v. Int'l Org. Masters, Mates & Pilots of Am., Inc.*, 497 Pa. 102, 108-09, 439 A.2d 621, 624 (1981), the Commonwealth Court opined that "[t]he difficulty in ascertaining the intent of the parties is that they seem not to have taken into consideration when entering into the Consent Decree that it expires mid-year while MA Plans run for a full calendar year." *UPMC*, No. 334 M.D. 2014, at 10. If UPMC was correct that it could terminate in-

---

[10] During this underlying litigation, UPMC forwarded an offer to contract for in-network coverage of Highmark's MA Plan subscribers between January 1, 2019, and June 30, 2019. Highmark did not accept the offer.

network access on June 30, 2019, then, the court reasoned, Highmark could not offer MA Plans that included UPMC access for any part of 2019, since such plans must be offered on a calendar-year basis.[11] In this regard, the court explained that the Center for Medicaid and Medicare Services ("CMS"), which oversees and approves Medicare Advantage programming, pays a set fee for an eligible person's care for an entire year, corresponding to the year-long coverage provided by a Medicare Advantage plan. Further, the court posited that, even if a partial-year plan would be permissible, subscribers to that plan would not have access to UPMC hospitals after June 30, 2019, "and whether they could obtain another MA Plan is problematic." *Id.* at 11.

The Commonwealth Court rejected UPMC's contention that the six-month runout provision of the Provider Agreements satisfied its obligation to remain in "contract" with Highmark. Instead, the court explained that the "continue to contract" language of VP-2 implicated extension of the entire Provider Agreements. Further, the court observed, Section 16.3's runout only begins once the Provider Agreements are terminated. Thus, the Commonwealth Court reasoned that, since the continue-to-contract provision applied to the entirety of the Provider Agreements, they could not be terminated until June 30, 2019, pursuant to the Consent Decree's terms.

Based on the above rationale, the court prohibited "UPMC from terminating the Provider Agreement for the calendar year 2019, [and instructed] that Highmark . . . not . . . represent that UPMC is in-network for any part of 2020 based on Section 16.3's run-out clause." *Id.* at 12 (alterations added). The court explained that "[t]his resolution is

---

[11] The Commonwealth Court also indicated that "agreements that provide access to providers are . . . for the [full calendar] year." *Id.* at 10 (citing 42 U.S.C. §1395W-27(c)). To the degree that the court is referencing provider agreements, the cited statutory provision does not support that assertion, as it pertains only to Medicare Advantage plans. *See* 42 U.S.C. §1395W-27(a) (explaining that this section pertains to contracts between Medicare Advantage-offering insurers and the federal government).

the same as fixing a June 30, 2019 date for termination of the Provider Agreement, then activating Section 16.3's runout provision with the obligations expiring December 30, 2019." *Id.* In the court's view, doing so provided certainty to MA Plan subscribers, as well as Highmark and UPMC, by ending all obligations on a date certain. The Commonwealth Court then entered, in relevant part, the following order:

> It is ordered that the Medicare Acute Care Provider Agreement and its amendments shall remain in effect until December 30, 2019. Highmark Health and Highmark, Inc. are ordered not to represent in any manner that UPMC is in-network for any part of 2020.

*Commonwealth v. UPMC*, 334 M.D. 2014 (Pa. Cmwlth. filed Jan. 29, 2018) (order).

UPMC appealed to this Court, which undertook the matter on an expedited schedule for briefing and oral argument.[12] UPMC presents the following issues for review:

1. Did the Commonwealth Court err by wrongly construing the term "continue to contract" in the second sentence of Paragraph IV(A)(2) of the UPMC Consent Decree ("VP-2") to require UPMC to renew the MA Agreements with Highmark for all of 2019 where: (1) the Consent Decree governs UPMC's obligations and expires by its terms on June 30, 2019; (2) this Court in its 2015 Opinion recognized that the existing MA Agreements might properly terminate prior to the end of the Consent Decree so long as there was "a contract" under which Highmark members would receive in-network services at UPMC through the term of the Consent Decree; (3) the parties all agree and this Court has unanimously recognized that VP-2 does not apply to Medicare Advantage; and (4) the Consent Decree itself forecloses involuntary renewal of those same agreements?

2. Did the Commonwealth Court err by granting relief against UPMC because UPMC at all times has met its obligations under the Consent Decree and has cured any alleged non-compliance, and because that court was without the authority either to abrogate UPMC's preexisting

---

[12] This Court has jurisdiction over appeals from final orders of matters originally commenced in the Commonwealth Court. *See* 42 Pa.C.S. §723(a).

contract rights or to impose obligations on UPMC that extend beyond the expiration of the Consent Decree?

3. Did the Commonwealth Court err by wrongly deciding preempted federal questions and interfering with the exclusive authority of the federal Centers for Medicare & Medicaid Services ("CMS") to (i) determine whether and when an insurer can market Medicare Advantage plans, (ii) assess the level of impact of midyear provider terminations on subscribers, and (iii) take steps to ameliorate any adverse impact?

Brief for UPMC at 4-5.

UPMC argues that it did not violate the Consent Decree and that the Commonwealth Court's decision is predicated on several errors. Initially, UPMC contends that the court's reasoning materially conflicts with the *Kane* Court's recognition that the "continue to contract" language in VP-2 does not apply to Medicare Advantage. UPMC further develops that, pursuant to *Kane*, the Consent Decree does not affect separate, preexisting contract rights and, to the contrary, forecloses the coerced renewal of the Provider Agreements that the Commonwealth Court ordered here. *See Kane*, 634 Pa. at 144, 129 A.3d at 469 (explaining that the Consent Decree "forecloses the automatic renewal" of the Provider Agreements).

Instead, UPMC advances that VP-3 was interpreted as allowing termination of the existing Provider Agreements, in accord with the terms therein, so long as UPMC maintained some form of in-network access for Highmark's MA consumers through the end of the Consent Decree. *See id.* at 143-44, 129 A.3d at 469 (explaining that the use of the term "In-Network" obliged UPMC to "have *a* contract with Highmark that establishes negotiated rates for . . . those in Medicare Advantage programs" (emphasis added)). UPMC finds additional support in that the Consent Decree explicitly admonishes that it is "not a contract extension and shall not be characterized as such." Consent Decree §I(A); *see Kane*, 634 Pa. at 144, 129 A.3d at 469 ("That [the Consent

Decree] is not a contract extension must be understood as only pertaining to . . . the Medicare Advantage provider agreements in effect at the time of entry of the Consent Decree."). UPMC proffers that the Commonwealth Court was bound to follow this Court's prior explication of the Consent Decree, and therefore, that it erred in mandating that UPMC renew the Provider Agreements for an additional, year-long term, beyond the end date of the Consent Decree. Moreover, UPMC contends that the court could not, consistent with contract principles, alter its contractual rights solely on the basis that the changes may better fit the circumstances. *See Steuart v. McChensey*, 498 Pa. 45, 50-51, 444 A.2d 659, 662 (1982) ("The court may not rewrite the contract for the purpose of accomplishing that which . . . may appear proper . . . because it later appears that a different agreement should have been consummated in the first instance." (quoting 17A C.J.S. *Contracts* §296(3))). Thus, although acknowledging the certainty and security purposes of the Consent Decree, UPMC posits that it is not an unlimited guarantee, and efforts to protect Medicare Advantage consumers cannot override the plain language of the contract.

UPMC also maintains that it is, and will remain, in full compliance with the Consent Decree. From UPMC's perspective, pursuant to the terms of the Provider Agreements and following its notice of termination, the annual renewals will end on December 31, 2018, at which time the six-month runout under Section 16.3 is triggered and will provide in-network access under the same terms, conditions, and rates through June 30, 2019. UPMC argues that there is no divergence between what the Consent Decree requires of UPMC and the contract-based obligations that UPMC already possesses.

Further, UPMC asserts that the runout provision satisfies the mandate for a contract, since post-termination obligations are regularly treated as contracts under

Pennsylvania law, with enforcement pursuant to contract-breach precepts, citing, *inter alia*, non-compete provisions of employment contracts as an example. *See, e.g., Hayes v. Altman*, 424 Pa. 23, 28-29, 225 A.2d 670, 672 (1967); *Seligman & Latz of Pittsburgh, Inc. v. Vernillo*, 382 Pa. 161, 166, 114 A.2d 672, 673-74 (1955). Additionally, UPMC criticizes OAG for failing to specify which terms it believes do not carry forward via the runout provision, or what makes the 6-month runout insufficient to satisfy UPMC's obligations under *Kane*. Instead, UPMC observes that the runout clause mandates that all of the obligations of the Provider Agreements remain. UPMC levels similar criticism at Highmark's arguments with respect to the runout provision, disputing the notion that interpretation of Section 16.3 of the Provider Agreements is a matter of fact, rather than law. Moreover, UPMC claims that it has cured any alleged non-compliance by proposing an additional written agreement confirming that it will continue to accept patients on an in-network basis through June 30, 2019, regardless of Highmark's position. *See supra* note 10.

Lastly, UPMC forwards that federal law preempts state courts from regulating Medicare Advantage plans, *see* 42 U.S.C. §1395w-26(b)(3), and that the Commonwealth Court erroneously interfered with and misconstrued the federal program. In contrast to the court's concern that midyear termination of a provider contract would be "problematic," *UPMC*, No. 334 M.D. 2014, at 11, UPMC observes that CMS permits such arrangements, even with respect to major providers, *see* MEDICARE MANAGED CARE MANUAL §110.1.2.1 (Significant Changes to Networks--General) (acknowledging that "significant network changes could result from no-cause provider terminations that are effective at any point during the contract year, whether it is mid-year or on January 1"), and has criteria and procedures to inform and protect

consumers when major provider network changes occur.[13] Additionally, UPMC argues that, by ordering it to maintain the Provider Agreements with Highmark through 2019, UPMC would also be obligated to honor the runout provision into 2020. According to UPMC, the court's order prohibiting Highmark from advertising such coverage intrudes upon CMS's exclusive province.

Along this same line, UPMC asserts that by rewriting the UPMC-Highmark provider contracts and deciding how Medicare Advantage should operate, the Commonwealth Court improperly substituted its judgment for that of CMS. In so doing, UPMC opines, the court has transformed the orderly transition that the Consent Decree was designed to ensure, and that CMS regulations contemplate, into a confusing and uncertain process that will prejudice enrollees. UPMC contends that the practical effect of the court's order is to merely delay for one year what is already going to occur, but in a manner that further muddles matters. Accordingly, UPMC asks for reversal of the Commonwealth Court's order.

Highmark responds that the Commonwealth Court's decision reflects an appropriate remedy to account for the mismatch between the Consent Decree's June 30, 2019 end date and the calendar year employed for Medicare Advantage plans, all in consideration of the terms of the agreements, the legal landscape surrounding the dispute, and the parties' course of dealing. Highmark proffers that the court's order eliminates the risk and uncertainty associated with UPMC's proposed 6-month contract, avoids potential CMS issues, and averts forcing the parties back to highly contentious negotiations in the final months of the Consent Decree.

---

[13] UPMC also contests as erroneous the apparent conclusion by the Commonwealth Court that provider agreements must be "for the entire year." *UPMC*, No. 334 M.D. 2014, at 10. As noted above, *see supra* note 10, to the degree the court relied on 42 U.S.C. §1395w-27(c) for this proposition, doing so was in error.

Highmark argues that the Vulnerable Populations clause obligates UPMC to "have a contract" to provide in-network coverage to Highmark's MA consumers pursuant to VP-3 and the definition of "In-Network." *Kane*, 634 Pa. at 143-44, 129 A.3d at 469. In this respect, Highmark opines that the Commonwealth Court's reliance on the "continue to contract" language of VP-2 is irrelevant, since VP-3 has already been interpreted by the *Kane* Court as mandating the same on-going contractual obligations with respect to Highmark's MA consumers. *See id.* Highmark contends that UPMC cannot now relitigate its obligations to remain a Medicare provider through the end of the Consent Decree.

As to the ordered continuation of the Provider Agreements, although Highmark acknowledges that the Consent Decree does not dictate the terms of those agreements, it notes that the parties have consistently employed roll-overs of the Provider Agreements for full calendar years since at least 1999. Highmark posits that the Commonwealth Court's consideration of that fact in fashioning a remedy was entirely proper to ensure certainty and prevent chaos. In this respect, Highmark emphasizes that the overriding intention to protect consumers appropriately controls the understanding of the Consent Decree, since, subject to contract precepts, the document must be "read as a whole . . . to give effect to its true purpose." *Kane*, 634 Pa. at 135, 129 A.3d at 463-64 (citing *Pritchard v. Wick*, 406 Pa. 598, 601, 178 A.2d 725, 727 (1962)).

Highmark further challenges UPMC's claim that the six-month runout provision contained in the Provider Agreements satisfies its obligation under the Consent Decree to be "in a contract" through June 30, 2019. Highmark notes that the runout provision, by its own terms, applies only *after* the Provider Agreements are terminated, which, as a finding of fact, is entitled deference. Thus, it views this clause as devised to allow the

parties to "wrap up their affairs such as audit rights, return of documents, and other housekeeping matters *after* the contract has ended." Brief for Highmark at 41 (emphasis in original). Highmark distinguishes this post-termination period with the enrollment of new patients or the creation of new obligations. Highmark further contrasts contractual agreements insofar as Pennsylvania courts have refused to recognize contract-based legal theories in the context of post-termination obligations. *See, e.g., Wilson Area Sch. Dist. v. Skepton,* 586 Pa. 513, 520, 895 A.2d 1250, 1254 (2006) (opinion announcing the judgment of the Court) (refusing to apply unjust enrichment principles when there is an underlying contract). Thus, Highmark suggests that it defies logic to treat such a provision as a "contract" as required under the Consent Decree and insists that "something else was needed to fully enforce the Consent Decrees and realize their objectives." Brief for Highmark at 43.

Lastly, Highmark posits that the court's remedy of mandating full-year coverage of MA Plan enrollees in 2019 avoids the potential problems associated with CMS's approval of a plan offering only six months of in-network access. Highmark observes that no party offered evidence from CMS as to whether or on what terms CMS would approve a six-month contract like the one UPMC proposes. Given this, Highmark develops that the Commonwealth Court removed uncertainty from the equation by requiring UPMC to remain for all of 2019 using the Provider Agreements that CMS had approved every year since 1999. Highmark opines that this remedy was further justified by the parties' longstanding practice of having calendar-year agreements. Highmark contends that, in contrast, UPMC's six-month runout-contract position injects confusion and disorder. Accordingly, Highmark urges this Court to affirm the Commonwealth Court's order.

OAG's view largely aligns with that of Highmark in support of the Commonwealth Court's decision, particularly regarding the notion that the court's order avoids the uncertainty resulting from the midyear loss of UPMC as a provider for Highmark's MA Plans. OAG similarly contests the propriety of treating the runout provision as a contract, observing that the Provider Agreement lists twenty-four obligations of UPMC as provider, "some of which are beyond the scope of providing services and accepting payment." Brief for OAG at 14-15. Additionally, although OAG does not defend the Commonwealth Court's reliance on the "continue to contract" language of VP-2, it argues that VP-3 mandates essentially the same conclusion. In this regard, OAG posits that the order requiring that UPMC continue to provide in-network coverage until the end of 2019 reflects the "nature of the contract agreed to by the parties." Brief for OAG at 18. For this reason, it finds the challenged order distinguishable from a contract extension that may violate the Consent Decree's introductory paragraph.

Further, although acknowledging that contracts between insurers and providers are not required to align with the calendar year, OAG contends that the sophisticated and experienced parties involved here negotiated for year-to-year agreements, rather than entering into shorter term ones. With respect to CMS, the OAG adds to Highmark's perspective by observing that CMS has interpreted its preemption provision, *see* 42 U.S.C. §1395w-26(b)(3), as not impacting general state contract principles developed via case law. *See* Medicare Program; Establishment of the Medicare Advantage Program, 69 FED. REG. 46866-01, 46913-14 (Aug. 3, 2004). Thus, OAG also advocates for affirmance of the Commonwealth Court.

To begin, we reiterate the precepts relevant to this matter as outlined in *Kane*. A consent decree is a judicially sanctioned contract that is interpreted in accordance with the principles governing all contracts; our primary objective is ascertaining the intent of

the parties. *See Kane*, 634 Pa. at 133-34, 129 A.3d at 463 (citing *Int'l Org. Master, Mates & Pilots of Am.*, 497 Pa. at 108, 439 A.2d at 624-25; *Lesko v. Frankford Hosp.- Bucks Cnty.*, 609 Pa. 115, 123, 15 A.3d 337, 342 (2011)). Where the terms of the contract are unambiguous, they are deemed to reflect the intent of the parties. *See id.* at 134, 129 A.3d at 463 (citing *Kripp v. Kripp*, 578 Pa. 82, 90, 849 A.2d 1159, 1163 (2004)). Additionally, in determining intent, we are mindful to examine "the entire contract . . ., taking into consideration the surrounding circumstances, the situation of the parties when the contract was made and the objects they apparently had in view and the nature of the subject matter." *Lower Frederick Twp. v. Clemmer*, 518 Pa. 313, 329, 543 A.2d 502, 510 (1988) (quoting *Mather Estate*, 410 Pa. 361, 366–67, 189 A.2d 586, 589 (1963)).

However, "in the absence of fraud, accident or mistake, [courts have] neither the power nor the authority to modify or vary the terms set forth." *Universal Builders Supply, Inc. v. Shaler Highlands Corp.*, 405 Pa. 259, 265, 175 A.2d 58, 61 (1961) (citing *Buffington v. Buffington*, 378 Pa. 149, 106 A.2d 229 (1954)). Extrinsic evidence may be employed to ascertain the meaning of contractual terms only when they are ambiguous, *i.e.*, subject to more than one reasonable interpretation. *Murphy v. Duquesne Univ. of the Holy Ghost*, 565 Pa. 571, 591, 777 A.2d 418, 429-30 (2001) (citation omitted). Interpreting the terms of a contract is a question of law, thus implicating a *de novo* standard of review and a plenary scope of review. *McMullen v. Kutz*, 603 Pa. 602, 609, 985 A.2d 769, 773 (2009) (citation omitted).

With these precepts in mind, we turn first to the obligations that the Consent Decree places on UPMC with regard to treating all Highmark MA Plan subscribers as "In-Network." The parties agree that it is VP-3, rather than VP-2, that is operative with respect to MA Plans. Accordingly, the Commonwealth Court's particularized focus on

the "continue to contract" language from VP-2 was in error. Nevertheless, as Highmark and OAG develop, the obligation outlined by the Commonwealth Court in this matter is similar to the burden that the *Kane* Court found applicable to UPMC based on VP-3, *i.e.*, that VP-3 "obliges UPMC . . . to have a contract with Highmark that establishes negotiated rates for treatment of those in [MA Plans] for which Highmark currently has provider contracts with UPMC." *Kane*, 634 Pa. at 143, 129 A.3d at 469. Although UPMC challenged the Commonwealth Court's reliance on VP-2, it expressly recognizes that it is bound to provide in-network coverage pursuant to VP-3.

Additionally, the parties appear to generally agree that, with respect to the VP-3 obligation, the Consent Decree does not mandate the renewal of the Provider Agreements or require any particular contract terms, contrary to the Commonwealth Court's rationale. *See Kane*, 634 Pa. at 144-45, 129 A.3d at 469. There is also no dispute that the Consent Decree, by its terms, expires on June 30, 2019.

As to the parties' divergent views regarding UPMC satisfying its obligation under the Consent Decree, we largely agree with the perspective advocated by UPMC. As UPMC observes, in construing the Consent Decree's introductory language that it was not a contract extension and "foreclos[ing] the automatic renewal" of the Provider Agreements, the *Kane* Court recognized the permissibility of terminating the Provider Agreements. *Kane*, 634 Pa. at 144, 129 A.3d at 469.[14] Although Highmark and OAG do not defend this forced renewal as being required by the Consent Decree, they argue that the Commonwealth Court's order was an appropriate and reasonable means of remedying the mismatch between the midyear end date of the Consent Decree and the calendar year upon which the Provider Agreements had previously been employed and

---

[14] Indeed, UPMC's intended termination of the Provider Agreements as of December 31, 2015, formed a central part of the controversy in *Kane*. *See id.*

MA Plans are required to operate. Our primary hesitation with this is approach is that it alters an unambiguous and material term of the Consent Decree -- the June 30, 2019 end date. The Commonwealth Court, along with Highmark and OAG, nonetheless rationalize this reformation predicated on the belief that a midyear termination would cause such confusion to MA Plan consumers so as to substantively disrupt the primary goal of the Consent Decree and/or be precluded altogether by CMS's disapproval of MA Plans that enjoy UPMC access for only six months.

Regarding CMS, Highmark notes that no party advanced evidence as to how CMS may specifically view a MA Plan that only provides six months of access to UPMC facilities. However, as UPMC emphasizes, CMS rules and regulations are expressly designed to address midyear losses of providers, while also providing consumers with prompt and accurate information to deal with such circumstances.[15] Further, Highmark already has MA Plans that do not include UPMC as a provider, which suggests that a six-month-UPMC-inclusive plan could be supplemented in such a manner as to provide the requisite provider coverage to receive CMS approval. *See supra* note 5. Thus, while there may be a colorable belief that the loss of UPMC as a provider for Highmark

---

[15] *See, e.g.*, 42 C.F.R. §422.111(e) (mandating notification at least 30-days in advance of any termination of a provider serving patients on a regular basis); MEDICARE MANAGED CARE MANUAL §110.1.2.1 (Significant Changes to Network--General) ("CMS recognizes that significant no-cause network changes may occur during the contract year."); §110.1.2.2. (Notification to CMS) ("CMS would like to ensure that appropriate contingency planning is in place prior to an [Medicare Advantage Organization] making any significant network change."); *id.* (requiring MA insurers to provide notice to CMS of any significant network change and requiring them to ensure affected enrollees are able to locate new providers and contract with additional providers if needed); §110.1.2.3 (Notification to Enrollees) (mandating that consumers be informed of provider terminations with 30-day advance notice); §110.1.2.5 (Significant Network Change Special Election Period) (permitting enrollees who are substantially affected by a significant network termination to change Medicare Advantage plans outside the usual election period).

plans may be disruptive, conjecture of this nature is insufficient to alter the unambiguous termination date of the Consent Decree.

Regarding the potential confusion caused by midyear termination, although this concern may also be described as somewhat speculative, given the lack of record evidence to substantiate it, the submitted documentation with respect to CMS, including CMS's website, as well as the relevant regulations, rules, and statutes, lends some credence to the notion that the loss of a provider, particularly one the size of UPMC, may be disruptive. However, CMS's anticipation of, and well-developed contingencies for, these instances diminish the proffered potential impacts of chaos and confusion, even in the case of significant network changes midyear. *See, e.g.,* 42 C.F.R. §110.1.2.5 (Significant Network Change Special Election Period). Moreover, Highmark's MA Plan documents reflect its acknowledgment of the June 2019 cutoff of UPMC provider obligations and marks efforts by Highmark to apprise enrollees of this change, which appear aimed at reducing any confusion in the first instance. *See, e.g.,* Highmark 2017 Frequently Asked Questions ("UPMC providers will remain [in-network] through June 2019."); HIGHMARK, Know Your Options for Care - Access for Seniors, http://discoverhighmark.com/employer/provider-search/consent-decree/?region =westernpa (last visited Oct. 3, 2017) ("Highmark members . . . will have access to most UPMC providers on an in-network benefit level through June 2019.").[16]

Further, as highlighted by OAG, the parties that negotiated and entered into the Consent Decree are highly sophisticated and experienced in matters pertaining to

---

[16] Additionally, there is arguably some concern with the uncertainty that may result from the Provider Agreements ending on December 30, 2019, leaving MA Plan subscribers without access to UPMC facilities for only one day, *i.e.,* December 31, 2019. This situation would be particularly accentuated if enrollees needed to join another MA program for only one day pursuant to a special election period.

Medicare. *See* Brief for OAG at 18-19. This seems to belie the Commonwealth Court's view that the parties failed to consider the midyear end date when agreeing to the Consent Decree's terms. *See UPMC*, No. 334 M.D. 2014, at 10. Rather, it appears, on this record, just as likely that the end date was set midyear to align with the six-month runout provision of the Provider Agreement, which itself was adopted prior to the circumstances leading to the Consent Decree. *See supra* note 6. Thus, we remain unpersuaded that the combination of the Provider Agreements and the Consent Decree created some ambiguity or problem that necessitated a "remedy."

In accord with the above reasoning, we conclude that UPMC's obligations, pursuant to VP-3 of the Consent Decree, requires it to contract to provide in-network coverage to Highmark's MA Plan consumers through June 30, 2019. Further, we find no basis upon which to alter this unambiguous date, to which the parties agreed, and correspondingly, no foundation for ordering the renewal of the Provider Agreements for the entirety of the 2019 calendar year. However, that does not conclude our inquiry, as there remains unresolved the matter of access to UPMC facilities on an in-network basis for the first six months of 2019, as required by the Consent Decrees.

As to those first six months, we disagree with OAG and Highmark that the runout clause of the Provider Agreements fails to constitute a contract that satisfies UPMC's obligation to remain in-network. In this regard, OAG and Highmark implicitly concede that the Provider Agreements suffice as a contract, since they advocate in favor of an extension of those agreements through 2019 in satisfaction of UPMC's obligation. The runout provision, which is a term of those contracts, provides that UPMC will continue to be "obligated" by all of the same terms of the Provider Agreements that were applicable during the annual renewal periods. Provider Agreements §16.3 (as amended). Thus, it seems self-evident that UPMC is in a contract to provide in-network access during the

first six months of 2019. Stated more directly, there is a presently existing contract (*i.e.*, the Provider Agreements), to which the parties have assented, and which delineates the essential terms, supported by consideration, that obliges UPMC to provide in-network access through June 30, 2019. *See Shovel Transfer & Storage, Inc. v. Pa. Liquor Control Bd.*, 559 Pa. 56, 62-63, 739 A.2d 133, 136 (1999) (explaining that a contract is created when there is mutual assent to the essential terms by the parties which they intend to be binding (citations omitted)). Moreover, it appears that if UPMC failed to fulfill its obligations pursuant to the runout clause, a breach-of-contract cause of action would be cognizable. In this sense, the "termination" referred to in the runout provision may be more accurately considered an end to the annual renewal provision of the Provider Agreements, which then triggers a new, one-time, six-month contract period that continues the operative provisions of the contract.

Accordingly, we reject Highmark's claim that "something else" was needed to constitute a contract. Brief for Highmark at 43. Nor do we agree with the attempts to minimize the import of the runout provision, or divorce it from the Provider Agreements, by characterizing that clause as a mere "term" of the contract. Rather, as discussed above, the Provider Agreements, *in toto*, mandate in-network access to UPMC facilities through the first half of 2019, thus satisfying the substantive requirement of the Consent Decree that UPMC "treat those participants in Highmark [MA Plans] as 'In-Network.'" *Kane*, 634 Pa. at 143, 129 A.3d at 469. Further, OAG's generalized assertion that the runout provision differs from the relevant obligations of UPMC in some manner, *see* Brief for OAG at 14-15, facially conflicts with the terms of that clause. *See* Provider Agreement §16.3 ("[UPMC] shall be obligated to continue to comply with the terms and conditions of this Agreement and continue to provide services to [Highmark's] Members . . .." (alteration added)).

In summary, we conclude that the runout provision of the Provider Agreement satisfies UPMC's obligation to contract for in-network access to its facilities for Highmark's MA Plan subscribers through June 30, 2019. Accordingly, we reverse the order of the Commonwealth Court.[17]

Justices Baer, Todd, Donohue, Dougherty and Wecht join the opinion.

Justice Mundy did not participate in the consideration or decision of this case.

---

[17] Since we conclude that the current Provider Agreements satisfy UPMC's obligations, we need not address the effect of UPMC's attempt to cure. As to UPMC's CMS-related claims, although we disagree with the Commonwealth Court's analysis with respect to the impact of midyear terminations, as already discussed, the disposition of this matter renders the marketing/advertising issue effectively moot.