J-A27025-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| CRISTY CAUCHON LAKHMNA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| GAGANDEEP S. LAKHMNA | : | |
| | : | |
| Appellant | : | No. 984 EDA 2018 |

Appeal from the Order Entered March 19, 2018
In the Court of Common Pleas of Philadelphia County Family Court at
No(s):  8517 September Term, 2012

BEFORE:  BOWES, J., STABILE, J., and McLAUGHLIN, J.

DISSENTING MEMORANDUM BY BOWES, J.:          **FILED APRIL 24, 2019**

I believe the parties' postnuptial agreement unambiguously contemplates that Wife will sell her unit in Husband's building as soon as reasonably possible to effectuate the division of the parties' assets.  Further, I view Wife's chosen course of action as contrary to her duty of good faith and fair dealing in the performance of her contractual duties.  Therefore, I respectfully dissent.

The Majority correctly states that our standard of review is *de novo* on issues of contract interpretation, and that our goal is to effectuate the intent of the parties.  Majority Memorandum at 5.  The Majority properly reiterates that, when the writing is unambiguous, we must ascertain the parties' intent from the language of the contract alone, viewing the contract as a whole to give effect to all of its provisions.  *Id*. at 5-6.  However, in my view, the

Majority's interpretation of the contract at issue is not consistent with the intent of the parties as evidenced from the contract as a whole.

As our Supreme Court has stated, "in determining intent, we are mindful to examine the entire contract, taking into consideration the surrounding circumstances, the situation of the parties when the contract was made and the objects they apparently had in view and the nature of the subject matter." *Commonwealth by Shapiro v. UPMC*, 188 A.3d 1122, 1131 (Pa. 2018) (cleaned up). Additionally, "every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." *Stamerro v. Stamerro*, 889 A.2d 1251, 1259 (Pa.Super. 2005) (cleaned up). A lack of requisite good faith is demonstrated by, *inter alia*, "evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance." *Id*. (citation and internal quotation marks omitted).

Moreover, "[i]n the absence of an express term, the doctrine of necessary implication may act to imply a requirement necessitated by reason and justice without which the intent of the parties is frustrated." *Id*. (citation and internal quotation marks omitted). Pursuant to this doctrine,

> the law will imply an agreement by the parties to a contract to do and perform those things that according to reason and justice they should do in order to carry out the purpose for which the contract was made and to refrain from doing anything that would destroy or injure the other party's right to receive the fruits of the contract.

*Id*. (citation and internal quotation marks omitted). Although implied duties cannot defeat the express language of a contract, "[b]oth the implied covenant of good faith and the doctrine of necessary implication are principles for courts to harmonize the reasonable expectations of the parties with the intent of the contractors and the terms in their contract." *Id*. (citation and internal quotation marks omitted).

For example, in **Stamerro**, **supra**, the parties' comprehensive marital settlement agreement provided, *inter alia*, that the husband would pay the wife $1,200 per week for ten years, and that the amount was nonmodifiable so long as his annual income was between $200,000 and $600,000. In the five years prior to execution of the agreement, husband had been earning between $350,000 and $400,000 per year. The next year, husband voluntarily left his employment and took a job with a company owned by his new wife and began earning $83,000 per year. Husband moved for reduction in the alimony payments, the trial court denied the request, husband appealed, and this Court affirmed. This Court applied the above principles to the facts of that case as follows.

> the parties' contract imposed a duty of good faith to perform contractual obligations diligently and honestly. Husband consented to pay [w]ife $1200.00 per week in alimony as long as his gross income did not go below $200,000.00. Husband conceded he was not fired from his lucrative employment . . . . Moreover, [h]usband presented no evidence of a company-imposed salary reduction to support his claim that his job was in jeopardy, due to lower sales volume and changes in the business environment. Husband should not be allowed to evade the spirit

- 3 -

or abuse the terms of the agreement by unilaterally and voluntarily reducing his income. To do so would destroy [w]ife's right to receive the fruits of her bargained-for agreement.

Similarly, the doctrine of necessary implication serves to prohibit [h]usband from voluntarily reducing his income. Although the agreement did not expressly state that [h]usband could seek a reduced alimony payment only upon an involuntary salary reduction, to infer otherwise would give [h]usband the power to unilaterally defeat the purpose for which the alimony agreement was made, and to destroy [w]ife's right to receive the benefit of the support for which she bargained. To prevent this injustice, the trial court properly imputed this requirement into the contract.

*Stamerro*, *supra* at 1261-62 (citations omitted).

I find this analysis highly instructive in interpreting the postnuptial agreement at issue in the case *sub judice*. The express purpose of the agreement was to divide the parties' assets and debts, rather than have a court do so, to effectuate their "wish to live separately and apart from each other." Postnuptial Agreement, 10/13/15, at 1, 3. The terms of the agreement evidence this desire to completely separate the parties' debts and interests in various pieces of property.

Under the agreement, Husband agreed to assume the only joint debt of the parties—$76,682.47 owed to American Express. *Id*. at 5. The three main joint assets addressed were the company 1808 Spruce Street, LLC, the real estate located at 1808 Spruce Street, and real estate located at 1216 S. 12th Street. The 1216 S. 12th Street property, valued at $126,000, was to be transferred to Wife following Husband's satisfaction of an outstanding mortgage, after which Wife would forever hold Husband harmless for any

- 4 -

expense connected with the property. *Id*. at 8. Regarding the LLC, a company jointly owned by the parties with no designated value, Wife was to be removed as a member of the company and as a debtor on the mortgage incurred by it, after which Husband would forever hold Wife harmless for any expenses connected with the business. *Id*. at 6.

The remaining joint asset—the three units located at 1808 Spruce Street—was to be divided as follows.

> 7.3.1 1808 Spruce Street, Unit 3, Philadelphia, PA (appraised value of $1.3 million) shall be transferred to [Wife] in a fashion that minimizes the cost of the transfer. This property shall be transferred to [Wife] free and clear of any liens, mortgages, or encumbrances, with clear title and with a valid Certificate of Occupancy. [Husband] shall be responsible to arrange the transfer of title to [Wife] by October 26, 2015. Upon signing of this agreement, even prior to the transfer, [Wife] shall have exclusive decision making authority with regard to the **current sale listing** of this unit.

> 7.3.2 Upon[ ]a bona fide sale of 1808 Spruce Street, Unit 3, to a third party, the parties shall divide the net proceeds 70% to [Wife] and 30% to [Husband]. Net proceeds shall be defined as customary costs of sale including, but not limited to, Realtor fees and transfer taxes. No other expenses or mortgages or expenses shall be allowable as deduction to the sales price. [Wife] shall have sole discretion regarding the sale of the property including, but not limited to, choice of Realtor and listing or sale price. Should the property not be sold until after [Husband]'s death, [Husband]'s share of the proceeds shall be placed in a trust for [the parties' child]. This property shall not be sold for less than the [higher] of the fair market value at the time of sale or $1,450,000.00.

> 7.3.3 [Husband] shall retain 1808 Spruce Street, Unit 1 (appraised value [$]2.1 million) and Unit 2 (appraised value [$]1.2 million).

*Id*. at 7 (emphasis added).

The Majority concludes that this agreement does not require Wife to ever sell Unit 3 of the property. It opines that interpreting the contract to impose a duty upon Wife to follow through with the then-existing listing of Unit 3 for sale would be inconsistent with, and render null, the provisions indicating that Wife held a fee simple absolute in the property. Majority Memorandum at 6-7. The Majority cites Wife's sole discretion in the listing of Unit 3, the lack of any provision prohibiting Wife from taking the property off the market, and the requirement that the property be sold at no less than $150,000 above the indicated appraised value, as indicative of the parties' contemplation of "a possible indefinite delay in the sale[.]" *Id*. at 7. The Majority further finds support for its holding that "the agreement left open the possibility that a sale of the property, if it occurred at all, would take place at an indefinite time well into the future" in the fact that the contract addresses the possibility that the sale might not occur until after Husband's death. My colleagues point to the lack of any indication "that Husband is of advanced age or terminally ill, and § 7.3.2 does not purport to apply in the event of Husband's accidental or tragic death before the completion of a sale." *Id*. at 6.

While there is no doubt that the postnuptial agreement contemplates that it may take some time for Wife to sell Unit 3 based upon the minimum-sale-price requirement, I cannot agree with the Majority's interpretation of the

contract to impose no duty upon Wife to make reasonable, sustained efforts to sell Unit 3, and rather to allow Wife to take the property off the market, potentially for the remainder of her life, and instead rent it to a third party.

First, § 7.3.1 provides that Wife shall have exclusive decision making authority regarding the **current** listing of Unit 3. While "current" is not included in § 7.3.2 when Wife's "sole discretion regarding the sale of the property" is again referenced, I do not view this as an indication that the sale need not move forward. Rather, because that reiteration is stated in connection with provisions excluding realtor fees from the calculation of net proceeds, the provision indicates that Wife's decision to go with a realtor that may charge higher fees will not be counted against her in dividing the proceeds. The contract nonetheless expressly provides that efforts to sell Unit 3 take place "current" with its execution.

Second, the fact that the agreement provides for the contingency that Husband is no longer living when the sale occurs, without acknowledging a reason for Husband to expect his life to end in the near future, does not suggest that the parties intended for Wife to completely forgo a sale of Unit 3. It is a sad fact of life that people die unexpectedly without warning. Knowing that this loose end of the sale of Unit 3 for at least $1.45 million is outside of his control, Husband's desire to direct that his share be placed in trust for his child rather than pass through his estate, in the event that he suffered an untimely demise, is a reasonable precaution. It does not express

a willingness to allow Wife to willfully deprive Husband of his 30% share of $435,000 or more for the remainder of his life through her intentional act of making no effort at all to exercise her discretion in choosing a realtor to effectuate the sale.

Third, I fail to read an acquiescence to indefinite delay in the fact that the minimum sale price of Unit 3 must be 10% above the appraised value stated in the contract. The Majority cites nothing in the record to indicate when the appraisal was done. Hence, we do not know if that value was indicative of the market value at the time of the agreement as opposed to the value as of the date of separation for purposes of equitably distributing the parties' property. In any event, I cannot conclude as the Majority does that this difference in values absolves Wife of any obligation to make reasonable efforts to complete the expressly-contemplated current sale of Unit 3.

Finally, granting Wife a fee simple absolute in Unit 3, and allowing her to take a mortgage on the property pending its sale, is not inconsistent with Wife's agreement to follow through with the sale of her property. The parties could not sell Unit 3 without the type of continued interactions that they expressly sought to minimize unless the property was placed in one party's name or the other. As the sale of Unit 3 was designed to provide Wife with the majority of her share of the distribution of marital assets, it is logical that the property was placed in her name to give her control over obtaining and

maximizing her 70% share of the net proceeds. What does not logically follow is that Wife use her control to deprive Husband of his 30% of Unit 3's value.

The parties expressed their desire to separate their lives and divide their property. They reached an agreement as to the division of marital property and debts, with Husband assuming the only enumerated joint debt, and the assets divided between them. Husband's 30% share of Unit 3's value is a significant portion of the assets that Wife agreed would belong to him. Therefore, while the agreement does not state a date by which Wife must sell Unit 3, nor provide that Wife may not keep it rather than sell it, I would hold that §§ 7.3.1 and 7.3.2 unambiguously intend that Wife maintain the then-current efforts to sell Unit 3, albeit with any realtor and listing specifics of her choosing.

Further, I would apply the reasoning of **Stamerro**, **supra** to interpret the contract to require Wife to make good faith efforts to sell Unit 3 within a reasonable time.[1] Just as the husband in **Stamerro** could not take advantage of the absence of express language forbidding his voluntary reduction in income to avoid his agreement to pay alimony, Wife cannot realize her share of the value of Unit 3 through a mortgage and rental while unilaterally and

---

[1] **See**, **e.g.**, **Francis Gerard Janson, P.C. v. Frost**, 618 A.2d 1003, 1006 (Pa.Super. 1993) ("[I]t is the general rule that where no time is agreed upon for the completion of a contract, it must be completed within a reasonable time under all the circumstances[.]").

purposefully depriving Husband of the benefit of his bargain. As the Majority's interpretation allows Wife to do so,[2] I must respectfully dissent.

---

[2] To be clear, I would hold Wife is required to keep the Unit 3 on the market for sale. Lease of the property is contrary to her contractual obligations only to the extent that a lease would interfere with her ability to complete a sale; short-term rental, with the lessee's understanding that the property could be shown or sold at any time, would not be impermissible. Likewise, obtaining a mortgage on the property that would be satisfied upon the sale of Unit 3 would not be in conflict with Wife's duty to make good-faith efforts to secure a buyer and complete the sale.