J-S61017-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| ESTATE OF MICHAEL A. BENYO AND JEFFREY BENYO, INDIVIDUALLY | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| SCOTT F. BREIDENBACH, ESQ., REPRESENTATIVE OF THE ESTATE OF MARSHA BENYO | : | |
| | : | |
| Appellant | : | No. 324 EDA 2017 |

Appeal from the Judgment Entered April 18, 2018
In the Court of Common Pleas of Chester County Civil Division at No(s):
2013-08348-CT

BEFORE:  BENDER, P.J.E., BOWES, J., and PANELLA, J.

MEMORANDUM BY BOWES, J.:                    **FILED MAY 13, 2019**

Scott F. Breidenbach, Esquire, personal representative of the estate of Marsha Benyo ("Wife"), appeals from the judgment entered against her in this dispute arising from the property settlement agreement she reached with her late husband, Michael Benyo ("Husband"), whose estate is represented by his brother, Jeffrey Benyo.  We affirm the verdict upon which the judgment was entered, but vacate the judgment and remand for further proceedings consistent with this memorandum.

We glean the following facts and history from the certified record. Husband and Wife married in 1989.  Husband was employed as a police officer with the North Coventry Township Police Department, and Wife worked as an account manager at Brown Printing Company.  Husband's employment entitled him to a defined benefit pension to which he made no personal

contributions, while Wife participated in a 401(k) retirement plan through her employer as well as a profit sharing plan.

When Husband retired from his position as police chief in 2010, he elected a joint annuity benefits option through the Pennsylvania Municipal Retirement System ("PMRS"). Under this option, Husband received a lesser monthly payment than he would have received on a single-life annuity based solely upon his life expectancy, but the payments of $2,137.99 per month would continue to be paid to Wife, as his joint annuitant, for the remainder of her life. Wife continued to work following Husband's retirement.

Husband filed a complaint in divorce on May 21, 2012, alleging that the marriage was irretrievably broken, requesting equitable distribution of marital property, and seeking that any property settlement agreement ("PSA") reached by the parties be incorporated in the final decree of divorce. The parties executed a jointly-prepared PSA on June 18, 2012. PSA, 6/18/12, at 5-6, 12. The agreement provided that it was to be incorporated into "any divorce decree that may be entered" and to "continue in full force and effect after such time as a final decree in divorce may be entered with respect to the parties." *Id*. at 2.

Pursuant to the PSA, Wife was to obtain Husband's share of the marital residence and pay Husband for half of the property's value within thirty days of the agreement. *Id*. at 6. The parties were to keep their respective bank accounts, vehicles, and personal property, but for the household furnishings, which Wife would retain and pay Husband for half of the value. *Id*. at 6-7.

- 2 -

Husband and Wife agreed to evenly divide household debts, as well as joint bank accounts totaling approximately $120,000. *Id*. at 3, 10. As to retirement benefits, the PSA states as follows:

> Husband agrees to waive all right, title and interest in Wife's Brown Printing Profit Sharing Plan. Husband will sign any necessary paperwork to facilitate said waiver. Wife will agree to waive all right, title and interest in Husband's Police Pension. Wife will sign any necessary paperwork upon demand to facilitate said waiver. In addition, Wife agrees to waive any death benefit from Husband's Pension. She will sign any necessary paperwork to facilitate said waiver. At the time of the signing of this Agreement, Wife is to receive a one hundred percent (100%) death benefit. If the Plan Administrator of said Pension will not permit a waiver of said death benefit to Wife or a change of beneficiary based on Wife's life expectancy, Wife will agree to sign any necessary paperwork, including a statement in writing that she waives the benefits and instructs her estate to make payment of any benefits it may receive to a beneficiary designated by Husband. As of the date of the signing of this Agreement, the designated beneficiary of the death benefit will be Jeffrey Benyo, who currently resides at 186 Upper Valley Road, Christiana, Pennsylvania. Unless Wife receives a written statement from Husband that the designated beneficiary has changed, any proceeds that she or her estate receives shall be paid to Jeffrey Benyo. It is understood that, if Wife fails to fulfill the obligation set forth in the Agreement, Jeffrey Benyo and/or the estate of Michael Benyo may pursue all claims he or the estate may have against Wife and may seek appropriate sanctions including but not limited to counsel fees.

> Currently Husband is receiving monthly payments from his Police Pension. The aforesaid benefits were used for the benefit of both parties. As a result, Wife agrees to reimburse Husband for fifty percent (50%) of the net proceeds he received since October 2010. Said reimbursement shall be performed on or before June 30, 2012. As of June 30, 2012, said reimbursement will be Seventeen Thousand Eight Hundred Twenty Dollars ($17,820).

> Wife currently has a 401(K) with Brown Printing. Wife agrees to transfer fifty percent (50%) of said 401(K) to Husband.

> Said 50% interest shall be calculated as of June 30, 2012. Husband shall also be entitled to any market increases of said interest as of June 30, 2012 and his interest shall be reduced by any market decreases that arise thereafter, as well. Husband, through his counsel, shall be responsible for drafting any Qualified Domestic Relations Order that is necessary to facilitate said transfer. Wife shall cooperate in signing said Qualified Domestic Relations Order [("QDRO")] within ten (10) days of demand.

*Id*. at 8-9.

Finally, the PSA provided that it was binding and remained in full force and effect until terminated under the terms of the PSA, that it would be incorporated in, but not merged with, "any Divorce Decree which may be granted by a court of competent jurisdiction," and that it inured to the benefit of their respective heirs and assigns. *Id*. at 5, 11.

Following execution of the PSA, Husband and Wife began performing their individual obligations under the PSA. Specifically, the parties divided up the bank account, Wife paid Husband for his shares of the marital residence and the furniture, and Husband transferred the deed to the property into Wife's name. N.T. Trial, 2/8/16, at 67-69, 93, 113, 116. Indeed, the only obligation under the PSA that was not performed was Wife's waiver of Husband's pension benefits.[1] *Id*. at 68-69.

The parties also moved forward with the divorce proceedings. On August 24, 2012, the parties executed a proposed QDRO, as well as affidavits

---

[1] PMRS advised Husband that he could not change the benefit option that he chose when he retired or choose a different person as his joint annuitant. *See* Wife's Trial Exhibit 5 (deposition of Sean E. Christine) at exhibit 8 (Letter of 10/11/12).

of consent to the entry of a final divorce decree.[2]  On September 4, 2012, notice of intent to request entry of the divorce decree was filed.  The executed QDRO was entered by the trial court on September 13, 2012.  A praecipe to transmit the record to the court for entry of the decree was filed on October 2, 2012.

On October 31, 2012, the trial court declined to enter the decree, and instead ordered that the record be returned to the prothonotary.  The court noted that the affidavit of service of the divorce complaint upon Wife demonstrated improper service.  It indicated that Husband was the one who had personally served Wife, although he was not competent to effectuate service.  Order 11/1/12 (citing Pa.R.C.P. 1930.4 (allowing service of original process by any competent adult), and Pa.R.C.P. 76 (defining competent adult as a person over eighteen years old who is not a party or the employee or relative of a party)).  Accordingly, the trial court directed the parties to correct the deficiency and file a new praecipe.

On November 2, 2012, the day after the trial court's order was mailed to the parties, Husband committed suicide.  Within days of Husband's death,

---

[2] Therein Wife affirmed, subject to the penalties for unsworn falsification to authorities in a document that was captioned with the pending divorce action, that the marriage was irretrievably broken and  that "ninety days have elapsed from the date of the filing and service of the complaint."  Wife's Affidavit of Consent, 9/6/12.

Husband's share of Wife's 401(k) was transferred to Husband pursuant to the QDRO.[3]

Husband's estate contacted PMRS concerning Husband's pension benefits, but was informed that there was no "death benefit" available because Husband made no personal contributions to the plan; that it viewed Wife as the proper recipient of the annuity payments; and that, if Wife waived her right to receive the benefits, PMRS would consider her as predeceasing Husband such that the payments would cease altogether. *See* Wife's Trial Exhibit 5 (Deposition of Sean E. Christine) at exhibit 6. On August 1, 2013, PMRS issued an official administrative decision that the PSA did not affect its obligation to pay the benefits to Wife, and that she was "the rightful recipient of [Husband's] pension benefit[.]" *Id*. at exhibit 8. Husband's estate did not appeal that decision. Accordingly, Wife continued to receive the annuity payments that she began receiving in January 2013. *See* N.T. Trial, 2/8/16, at 75.

Husband's estate and Jeffrey Benyo (collectively "Appellees") jointly filed a complaint against Wife on August 23, 2013, and an amended complaint on January 28, 2015, with much litigation in between.[4] The amended

---

[3] Wife testified that the transfer of money happened a few days after Husband's death, while Husband's estate suggested that it occurred immediately prior to his death. *See* N.T. Trial, 2/8/16, at 92. Either way, the timing of the transfer does not impact our resolution of the appeal.

[4] In addition to extensive filings in the instant case, the litigation during this time included an unsuccessful attempt by Wife to replace Jeffrey Benyo as administrator of Husband's estate in Berks County.

complaint stated four claims seeking: (1) that Wife be required to place all funds she received from PMRS in escrow pending disposition of the case; (2) a declaratory judgment that the PSA is enforceable; (3) a finding that Wife breached the PSA in failing to transfer the annuity payments from PMRS to Jeffrey Benyo and that damages were due; and (4) an order requiring Wife to transfer future payments from PMRS to Jeffrey Benyo, with reimbursement by him for any tax liability she incurred as a result. Wife filed an answer, new matter, and counterclaim which alleged that the PSA was unenforceable and the QDRO was invalid, and sought damages for conversion of her 401(k) funds and the damage Husband did to her home and her pets during the course of his suicide.

The case proceeded to a non-jury trial on February 8, 2016. Counsel engaged in extensive pre-trial discussion of the issues and legal theories. Although the trial court appeared to initially agree with Wife's positions concerning the availability of equitable relief and the validity of the QDRO, it ultimately decided to take evidence on all of the claims. The trial court heard testimony from Wife, the pension valuation expert presented by Husband's estate, and Sean Christine, PMRS chief of membership services, whose deposition testimony and correspondence file were also admitted into evidence.

The parties submitted written closing arguments following the trial, and the court entered its verdict on July 26, 2016.[5] The court found for Appellees and against Wife on both the claims of Appellees and Wife's counterclaim. Specifically, the court (1) declared that the PSA was valid and binding, that Jeffrey Benyo was an intended third-party beneficiary of the PSA, and that the PSA required Wife to remit the payments she received from PMRS to Husband's estate or Jeffrey Benyo; (2) found that Wife owes Husband's estate or Jeffrey Benyo $503,656.51 for breaching the PSA; (3) ordered Wife to transfer any future payments from PMRS to Jeffrey Benyo within ten days of their receipt, with Jeffrey to reimburse her for any taxes paid by Wife, and to refrain from terminating the benefits; and (4) concluded that Wife failed to prove that she was entitled to recover damages related to Husband's actions or the 401(k) funds transferred pursuant to the QDRO. The court further provided that, as long as Wife paid over the $79,414.08 in PMRS funds she had already received within sixty days and complied with the order concerning forwarding future payments to Jeffrey Benyo, Appellees were prohibited from registering a judgment on the verdict or executing upon one.

Wife filed a timely post-trial motion which the trial court denied on December 21, 2016. Wife filed a timely notice of appeal, and the trial court ordered her to file a statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). Wife then filed for bankruptcy, and the case was stayed.

_____

[5] The verdict is dated July 21, 2016, but the docket reflects that it was not served on the parties until July 26, 2016.

Wife died on October 15, 2017, and her trial/appellate counsel subsequently was appointed as personal representative of her estate. The bankruptcy stay was lifted, and the trial court issued a new Rule 1925(b) order. Wife's estate filed a timely Rule 1925(b) statement and a notice of death and substitution of successor. This Court, on March 26, 2018, noted that Wife had failed to reduce the verdict to judgment, and ordered that a praecipe to enter judgment and an updated docket be filed within ten days upon pain of having the appeal dismissed.[6] Thirteen days after Wife's estate failed to comply, the trial court entered an order in lieu of an opinion indicating that the appeal should be dismissed. Judgment was entered on the verdict on April 18, 2018, and an updated docket was filed in this court nine days later.

Wife's estate failed to file a timely brief, even after this Court granted an extension *nunc pro tunc*. Appellees filed a motion to quash the appeal based upon the absence of a brief. Wife's estate filed its brief the next day. This Court denied the motion to quash, providing that Appellees could raise

---

[6] As we discuss more fully *infra*, the circumstances of this case were such that the verdict was not actually ripe for reduction to judgment when this Court directed that judgment be entered, as the verdict expressly provided that it was not subject to recording or enforcement unless and until the trial court determined that Wife failed to comply with the equitable relief awarded to Appellees. However, there was no cause to quash the appeal even in the absence of a judgment, as the verdict was immediately appealable pursuant to Pa.R.A.P. 311(a)(4)(ii) (providing interlocutory order mandating conduct not previously mandated is immediately appealable when effective before entry of a final order) because it required Wife to pay Appellees past and future sums before a judgment would be entered against her.

the issue with the merits panel. Appellees then filed their one-page brief late, abandoning their quashal argument and merely requesting that this Court adopt the findings and conclusions of the trial court. Appellees' brief at unnumbered 1. Thus, the matter is finally ripe for our disposition.

Wife's estate presents the following questions for our review, which we have re-ordered for ease of disposition:

1) Did the lower court err by failing to dismiss, upon motion of [Wife], the equity counts in [Appellees'] amended complaint where the pleading failed to make any assertion of an inadequate remedy at law, failed to contain allegations of fact sufficient to establish an inadequate remedy at law, and in contradiction pleaded damages in excess of $500,000?

2) Did the lower court err by ruling that the QDRO was valid without in *personam* jurisdiction because it asserted that there was a valid divorce pending when the order was signed, where the divorce complaint was filed May 21, 2012, where the court found that [Wife] had not been served with process in the case within 30 days causing the complaint to lapse months before the order was signed without notice to [Wife]?

3) Did the lower court err by holding that [Wife] failed to carry her burden of proof that her 401(k) funds were converted by counterclaim defendants where the 9/13/2012 "QDRO" was signed without jurisdiction over [Wife], where the lack of service caused the divorce action to lapse, making the "QDRO" a nullity and void *ab initio*, where the court ruled on the record at the outset that "from my position any order issued under the divorce action is invalid" and, when challenged, the court emphasized "No. No. No. It's the ruling. It's not the position; it's the ruling"?

4) Did the court error [sic] by interpreting the focal paragraph addressing [Husband's] retirement benefits without considering the PMRL which provides definitions of terms used in the paragraph, such as "death benefits," "pension

- 10 -

benefits," and "survivor annuitant," and by ignoring the clearly applicable paragraphs within the agreement (e.g., para. 10 & 11) which provide that illegal provisions in the agreement must be stricken (para. 11), rather than motivating the court to violate another provision of the agreement by supplying, amending, modifying and revising the terms of the agreement which specifically confronts the imperative prohibition contained in paragraph 10 that "under no circumstance" shall the court have the power or authority to engage in such activity?

5) Did the court commit error by "re-writing" the terms of the [PSA] in its attempt to do indirectly that which the PSA failed to accomplish legally and in trying to circumvent the unassignability provision of 53 PS 881.115?

6) Did the lower court commit error and violate the anti-alienation provisions of 53 PS 881.115 and 53 PS 764 by ordering that [Wife] shall transfer any future payments (net proceeds after all taxes are paid) she receives as a beneficiary of [Husband's] police pension directly to Jeffrey Benyo. . . ?

Wife's brief[7,8] at 5-6 (unnecessary capitalization omitted).

We begin with a review of the applicable law. "On appeal from an order interpreting a marital settlement agreement, we must determine whether the trial court committed an error of law or an abuse of discretion. We do not

---

[7] Although it is Wife's estate that is pursuing this appeal, we shall refer to the appellant as "Wife" and cite to "Wife's brief" for the sake of simplicity.

[8] We note with displeasure that there is little or no correlation between the six questions stated and the six sections of argument offered in Wife's unartful and disjointed brief. For example, the argument for both questions regarding the QDRO (questions 2 and 4 in Wife's brief) are addressed together under subheading 5 in the argument section of the brief. Wife has made deciphering and analyzing its claims far more difficult than was necessary. The disorganized and less-than-forthright briefing by Wife, combined with Appellees' failure to submit any brief that addressed the issues, caused substantial delay in our resolution of this appeal.

usurp the trial court's fact-finding function." ***Tuthill v. Tuthill***, 763 A.2d 417, 419 (Pa.Super. 2000) (cleaned up).

Property settlement agreements are governed by the law of contracts and are enforceable at law or equity. ***Stamerro v. Stamerro***, 889 A.2d 1251, 1257, 1258 (Pa.Super. 2005). The goal of contract interpretation is to ascertain the intent of the parties. ***In re Estate of Hoffman***, 54 A.3d 903, 907 (Pa.Super. 2012). "When construing agreements involving clear and unambiguous terms, a trial court need only examine the writing itself to give effect to the parties' understanding." ***Id***. (cleaned up).

> Because contract interpretation is a question of law, this Court is not bound by the trial court's interpretation. Our standard of review over questions of law is *de novo* and to the extent necessary, the scope of our review is plenary as the appellate court may review the entire record in making its decision. This Court must construe the contract only as written and may not modify the plain meaning under the guise of interpretation. When a contract is free from ambiguity, the court must interpret the contract as written.

***Mazurek v. Russell***, 96 A.3d 372, 378 (Pa.Super. 2014) (cleaned up).

As our Supreme Court has stated, "in determining intent, we are mindful to examine the entire contract, taking into consideration the surrounding circumstances, the situation of the parties when the contract was made and the objects they apparently had in view and the nature of the subject matter." ***Commonwealth by Shapiro v. UPMC***, 188 A.3d 1122, 1131 (Pa. 2018). However, the unambiguous provisions of written contracts cannot be

contradicted or varied by oral testimony. *Halpin v. LaSalle Univ.*, 639 A.2d 37, 39 (Pa.Super. 1994).

With these principles in mind, we turn to the questions before us. Wife first contends that the trial court erred in allowing Appellees to proceed with their equity count because there was an adequate remedy at law. Wife's brief at 40. With no citation to authority to support its position, Wife maintains that the complaint "did not even remotely support an action in equity." *Id*. at 41. Wife further argues that she was subject to trial by ambush when the court indicated immediately before trial began that the equity claim was dismissed, but then changed its mind after a recess. *Id*.

The issue warrants no relief from this Court. As noted above, property settlement agreements are enforceable at law or equity. *Stamerro*, *supra* at 1258. The action at law for damages may include past-due payments plus interest, while equitable relief may include an order directing a party to comply with future obligations under the contract. *Id*. at 1257. Count one of Appellees' amended complaint requested that the trial court order Wife to place all funds she received from PMRS in escrow during the pendency of the litigation. Under the above-cited law, such was a valid request sounding in equity.

Regarding the timing of the trial court's decision to reinstate count one after it had dismissed it, Wife waived the issue because she failed to raise a contemporaneous objection. *See* N.T. Trial, 2/8/16, at 65. In any event, Wife has not even attempted to show that she suffered prejudice as a result of the

- 13 -

trial court's ruling. She offers no suggestion how Wife's trial strategy changed from the time of the dismissal of the count immediately prior to the lunch recess to its reinstatement immediately after lunch such that she was "ambushed" at trial. Moreover, the trial court ultimately determined that the dismissed-then-reinstated count was moot and awarded Appellees no relief upon it. As such, the claim is devoid of merit.

With her next two issues, Wife challenges the trial court's rejection of her counterclaim challenging the validity of the QDRO by which half of her 401(k) funds were transferred to Husband. Wife argues that the trial court lacked jurisdiction to enter the order because she had not received proper service of the divorce complaint, rendering it void *ab initio*. Wife's brief at 5, 48-53. She maintains that she had no knowledge that the divorce action was pending at the time she executed the PSA or the QDRO, and did not believe that either would take effect until after a divorce decree was entered. *Id*. at 45, 50. Wife further contends that the trial court initially properly ruled that the QDRO was invalid, and that she relied upon that ruling when she testified at trial. *Id*. at 45. Therefore, Wife asserts that she is entitled to an award of $133,750 plus interest against Husband's estate. *Id*. at 51. We disagree.

First, Wife misrepresents the finality of the pretrial ruling concerning the QDRO's validity. Wife correctly reports that the trial court initially stated its ruling was that "any order issued under the divorce action is invalid." Wife's brief at 16, 42; N.T. Trial, 2/8/16, at 19. However, Wife neglects to mention that the court continued to entertain argument on the issue, vocalized its

- 14 -

consideration of whether a QDRO could be entered "outside the context of a divorce," heard argument from Appellees' counsel that a QDRO can be entered to enforce a post-nuptial agreement without there being a divorce, and reframed the issue as being whether the PSA was valid and enforceable.[9] *Id*. at 19-30. Thus, it should have come as no surprise to Wife that the issue was revisited by the parties in the middle of trial, and the court explored the subject with an expert witness, who confirmed that a retirement plan "will accept a QDRO from whatever source as long as it's signed by a court." *Id*. at 121, 134.

Second, the court had jurisdiction on September 13, 2012 to enter the QDRO that Husband and Wife had executed on August 24, 2012. The divorce action was properly commenced by the filing of Husband's complaint. *See* Pa.R.C.P. 1920.3. While the record does not reflect compliance with the rules as to service of that complaint on Wife, the defect in service did not necessarily deprive the court of jurisdiction.

> The primary purpose of service is to give adequate notice of the pendency of an action. The idea of service of original process is to give reasonable assurance that a defendant will have actual knowledge of an action and of his or her duty to defend; if the manner of service is improper, then there is no such assurance. **Defects in the manner of service of original process are not fundamental or vital, however, and thus may be waived**.

---

[9] After reviewing the record, we fully understand the trial court's statement during the course of counsels' pre-trial presentation of the issues involved: "It's all starting to come back to me now. I think I blocked it out because I was suffering from some PTSD from listening to this the first time." N.T. Trial, 2/8/16, at 29-30.

2 Goodrich Amram 2d § 402:1 (footnotes omitted, emphasis added). "A defendant manifests an intent to submit to the court's jurisdiction when the defendant takes some action (beyond merely entering a written appearance) going to the merits of the case, which evidences an intent to forego objection to the defective service." *Fleehr v. Mummert*, 857 A.2d 683, 685 (Pa.Super. 2004) (internal quotation marks omitted).

At no time while the divorce action was pending did Wife object to service. On the contrary, Wife's execution of QDRO, captioned at the docket number of the pending divorce action, reflected both Wife's knowledge of the existence of the divorce proceeding and her intent to submit to the court's jurisdiction. Wife further evidenced her intent to submit to the court's jurisdiction by executing the affidavit of consent for that court to issue a divorce decree. As such, the defect in the manner of service was waived by Wife, and the court had personal jurisdiction.

Third, the trial court's rejection of Wife's claim that the parties intended the PSA to take effect only when the divorce was final is supported by the record. As detailed above, the plain language of the agreement states that it was to be incorporated into "any divorce decree that **may** be entered" and to "**continue** in full force and effect after such time as a final decree in divorce **may** be entered with respect to the parties."[10] *Id*. at 2 (emphasis added).

_____

[10] Wife testified that she did not believe that the agreement would take effect until the divorce was finalized because the PSA stated that it "'shall be in full

*See also id*. at 11 ("This Agreement shall be incorporated in, but not merged with or be impaired by any Divorce Decree which may be granted by a court of competent jurisdiction.  The Agreement shall survive such Decree in full force and effect . . . .").  A thing cannot "survive" or "continue" to exist **after** an event unless it also existed **before** that event.  The use of "any" divorce decree that "may" be entered supports this notion that the PSA was a certainty although the entry of divorce decree was indefinite.  As this language is clear and unambiguous, Wife's testimony to the contrary cannot be used to establish a different intent.  *See Halpin*, *supra* at 39.  Further, Wife's self-serving testimony is contradicted by the conduct of the parties.[11]

Fourth, entry of the QDRO was within the subject-matter jurisdiction of the court, and was not somehow invalidated by the fact that no divorce decree ultimately issued.  A QDRO "is a domestic relations order that creates, recognizes, or assigns to an alternate payee the right to receive all or a portion of the benefits payable to a participant under a pension plan subject to the Employee Retirement Income Security Act (ERISA)."  Wilder, Pa. Family Law Prac. and Proc. (5th ed.), at § 23-4 (footnote omitted).

_____

force after such time as a final decree in divorce may be entered.'"  N.T. Trial, 2/8/16, at 91 (purporting to quote PSA, 6/18/12, at 2).  However, the agreement actually states that it shall **continue** to be in force after the parties are divorced.  Counsel failed to note the inaccuracy of Wife's quote when repeating it in the brief of appellant.  *See* Wife's brief at 10.

[11] As noted earlier, although no divorce decree ever issued, Wife and Husband both performed all of their property-distributing obligations under the PSA but for Wife's waiver of Husband's pension benefits between their execution of the PSA and Husband's death.  N.T. Trial, 2/8/16, at 67-69, 93, 113, 116.

Under 23 Pa.C.S. § 3105, "almost all matters involving family law issues should be heard under the Divorce Code," regardless of whether there is an agreement that has been merged or incorporated into a divorce decree. ***Annechino v. Joire***, 946 A.2d 121, 122 (Pa.Super. 2008). This statute, along with 23 Pa.C.S. § 3323(f), allows courts to enforce agreements even if they were never "raised in the divorce pleadings" and grants the court "not only broad enforcement powers, but full equity and jurisdiction to issue orders necessary to protect the interests of the parties and effectuate economic justice and insure the fair and just settlement of the parties' property rights." ***Id***. at 124 (internal quotation marks omitted).

Hence, under Pennsylvania domestic relations law, a court with personal jurisdiction over the parties has subject matter jurisdiction to enter a QDRO pursuant to a property settlement agreement, even if not sought during the litigation of a divorce action. ***See*** Wilder, ***supra*** at § 23-4 "(A divorce action need not be involved so long as the QDRO is entered pursuant to a state 'domestic relations law.' . . . A QDRO may be used to enforce a property settlement agreement.") (footnote omitted).

For all of these reasons, Wife's 401(k) money was properly distributed through a QDRO that was executed pursuant to a valid PSA by Husband and Wife and issued by a court with both personal and subject-matter jurisdiction. Therefore, the trial court correctly determined that Wife failed to establish her entitlement to a verdict on her counterclaim. No relief from this Court is due with respect to Wife's challenges to the QDRO.

- 18 -

The remaining three issues raised by Wife concern the trial court's interpretation of the PSA and enforcement of that interpretation. We begin by reviewing the relevant language of the PSA:

> **Wife will agree to waive all right, title and interest in Husband's Police Pension**. Wife will sign any necessary paperwork upon demand to facilitate said waiver. In addition, Wife agrees to waive any death benefit from Husband's Pension. She will sign any necessary paperwork to facilitate said waiver. At the time of the signing of this Agreement, Wife is to receive a one hundred percent (100%) death benefit. If the Plan Administrator of said Pension will not permit a waiver of said death benefit to Wife **or a change of beneficiary based on Wife's life expectancy**, Wife will agree to sign any necessary paperwork, including a statement in writing that she waives the benefits and instructs her estate to make payment of any benefits it may receive to a beneficiary designated by Husband. As of the date of the signing of this Agreement, the designated beneficiary of the death benefit will be Jeffrey Benyo, who currently resides at 186 Upper Valley Road, Christiana, Pennsylvania. Unless Wife receives a written statement from Husband that the designated beneficiary has changed, **any proceeds that she or her estate receives shall be paid to Jeffrey Benyo**. It is understood that, if Wife fails to fulfill the obligation set forth in the Agreement, Jeffrey Benyo and/or the estate of Michael Benyo may pursue all claims he or the estate may have against Wife and may seek appropriate sanctions including but not limited to counsel fees.

PSA, 6/18/12, at 8 (emphasis added).

Wife contends that the payments she had been receiving from PMRS were neither part of Husband's pension nor a death benefit, as those terms are defined under the Municipal Police Pension Law, but rather joint annuitant benefits to which she was entitled in her own right. Wife's brief at 6. Wife further asserts that even if the PSA does provide for the waiver and/or assignment of the benefits she received from PMRS, applicable statutes

- 19 -

prohibit the assignment or transfer of municipal police pensions. *Id*. at 5 (citing 53 P.S. §§ 764 and 881.115), 27-31. Moreover, argues Wife, the trial court could not circumvent those statutes by ordering the transfer of the payments from PMRS after Wife received them. *Id*. at 6, 33-34.

None of Wife's arguments warrants our disturbing the trial court's verdict. Construing the PSA as a whole, giving meaning to all language, it is plain that the parties' clear and unambiguous intent was for Wife to give up all of her rights to receive money from PMRS in any form. Husband selected for his retirement benefit an annuity that was calculated at the time of Husband's retirement and based upon the combined life expectancy of himself and Wife. *See* N.T. Trial, 2/8/16, at 162, 184. There was no separate annuity for Wife; rather, Husband's pension was in the form of a single annuity which would continue to pay as long as one of the joint annuitants was alive. *See id*. at 162 (trial testimony of Sean Christine) ("So long as either one of them is alive, that annuity will continue to pay. One does not stop when another one begins, it's not two separate. It's one, based upon the entire length of the life expectancy [of both annuitants]."); *see also id*. at 147-48 (discussing that pension payments to Husband during his life and survivor annuity payments to Wife thereafter were "the same benefit"). As such, Wife's right to receive annuity payments if Husband predeceased her was an "interest in Husband's Police Pension" that she expressly agreed to forfeit in the first sentence of the PSA's provisions regarding retirement benefits. Wife's

construction distinguishing "survivor annuitant" benefits from "pension benefits" and "death benefits" does not change the fact that all of those benefits flow from Husband's pension.

Given the nature of the survivor annuity, Husband's selection of a survivor annuitant was irrevocable once he began to receive his pension benefits prior to the parties' separation, and he could not change the survivor annuitant from Wife to another person. ***See id***. at 160-61. This possibility was contemplated by the parties post-separation and expressly addressed in the PSA, which states "[i]f the Plan Administrator of said Pension will not permit a waiver of said death benefit to Wife **or a change of beneficiary based on Wife's life expectancy**, Wife will agree to sign any necessary paperwork, including a statement in writing that she waives the benefits and instructs her estate to make payment of **any benefits** it may receive to a beneficiary designated by Husband." PSA, 6/18/12, at 8 (emphasis added). The joint annuity was the only aspect of Husband's retirement benefits that was in any way tied to Wife's life expectancy. Hence, Wife's contention that the survivor annuity was not included in Wife's waiver of benefits utterly ignores the above provision of the PSA, as well as her agreement that "any proceeds that she or her estate receives shall be paid to Jeffrey Benyo." ***Id***. Accordingly, the trial court properly ruled that, under the terms of the PSA, Jeffrey Benyo, not Wife, was entitled to the payments from PMRS made after Husband's death.

Wife maintains, however, that Pennsylvania law makes assignment of the pension benefits from Wife to another person illegal. Wife relies upon two statutes in support of her contention. First, the Municipal Police Pension Law provides as follows: "The pension payments, herein provided for, shall not be subject to attachment, execution, levy, garnishment or other legal process, and shall be payable only to the member or his designated beneficiary and shall not be subject to assignment or transfer." 53 P.S. § 776 (footnote omitted). Similarly, the Pennsylvania Municipal Retirement Law states that "[t]he retirement allowance and the contributions of members to the fund, all contributions returned to contributors under the provisions of this act and the moneys in the fund created by this act, shall be exempt from any State or municipal tax and shall be unassignable except to a beneficiary." 53 P.S. § 881.115(a).

Wife argues that these statutes prohibit the assignment of Wife's interest in the survivor annuity to a third party, and prohibit the use of any legal process to require their transfer to a third party. Wife's brief at 27-32. Wife further asserts that, because the provision of the PSA assigning her rights in the pension benefits was illegal under the above statutes, the court could not circumvent the law by ordering Wife to transfer the funds to Jeffrey Benyo after they were paid to her by PMRS. *Id*. at 33-34 (quoting ***Employers' Liab. Assur. Corp. v. Fischer & Porter Co.***, 75 A.2d 8, 10 (Pa.Super. 1950)) ("It

is settled beyond question that the law will not aid one to recover on a contract expressly prohibited by law.").

Wife's argument is contrary to relevant precedent. Shortly after the 1950 case quoted by Wife was decided, this Court held that the legislature exempted police pensions from attachment "for the protection of the governmental agency," not in aid of delinquent husbands[.]" **Commonwealth v. Mooney**, 92 A.2d 258, 260 (Pa.Super. 1952). Thus, although a court could not require the police pension fund to distribute funds to someone other than the beneficiary, the funds were "attachable in the hands of the delinquent husband, when received by him and proceedings may be directed against him personally for failure to pay support though his only resources are derived from such payments."[12] **Id**.

_____

[12] The **Mooney** decision was later disapproved of by our Supreme Court, which held that police pensions **were** attachable in the hands of the agency for the purposes of enforcing support obligations. **See Young v. Young**, 488 A.2d 264, 268 (Pa. 1985). This Court further held that a government pension was subject to attachment to enforce a judgment entered upon a spouse's breach of a property settlement agreement. **Beltrami v. Rossi**, 726 A.2d 401 (Pa.Super. 1999). In 2010, the legislature codified the rule that rights under the Pennsylvania Municipal Retirement Law are indeed subject to attachment under an approved domestic relations order, which includes approval of a PSA entered into after July 9, 2010, relating to the marital property rights of a spouse or former spouse. **See** Subsection (b)(1) of 53 P.S. § 881.115(b)(1). **See also** 53 P.S. 881.102 (defining terms). While these provisions contradict Wife's claim that municipal pension funds are absolutely untouchable by any legal process while in the hands of the agency, they are not applicable here, as the trial court did not order PMRS to issue payments to a third party.

The trial court in this case did not attach Husband's pension by ordering PMRS to make the monthly payments to Jeffrey Benyo instead of to Wife. Rather, as in *Mooney*, it required Wife to transfer the amount of the payments she received to Jeffrey Benyo, as she promised to do when she executed the PSA. Sean Christine, PMRS chief of membership services, testified at trial that PMRS does not care what happens to the money after it paid it to Wife—she is free to transfer it without restriction. *See* N.T. Trial, 2/8/16, at 178 ("[I]t's similar to having your employer pay you. The employer pays you, and what you do with the money afterwards is your business."). We see no illegality in the trial court's enforcement of Wife's obligations under the PSA.

Indeed, this Court recently approved a similar resolution when faced with comparable facts in *In re Estate of Easterday*, 171 A.3d 911 (Pa.Super. 2017), *appeal granted in part*, 184 A.3d 542 (Pa. 2018). In that case, the spouses also entered into an agreement to waive their rights to each other's pensions, but the husband died before his beneficiary was changed and before grounds for divorce were established and a decree entered. Under ERISA, the payments could not be made to anyone other than the beneficiary designated in the retirement plan documents. To enforce the parties' agreement, therefore, the trial court ordered the wife to pay to decedent's estate all of the pension benefits she received from the plan. This Court affirmed, holding that, while ERISA removed the court's ability to require the retirement plan administrators to directly pay funds to a third party, it could enforce the

parties' property settlement agreement by ordering the wife to turn over to the  husband's estate all proceeds she had received, as well as any future proceeds she was entitled to receive.  *Id*. at 920.

Thus, pursuant to the law cited above, the trial court in the case *sub judice* did not circumvent any illegality by ordering Wife to comply with the PSA by remitting payments she received from PMRS to Jeffrey Benyo after she received them.

For all of the foregoing reasons, we affirm in full the trial court's verdict in favor of Appellees and against Wife.  However, it is necessary for us to vacate the judgment that was entered upon that verdict during the pendency of this appeal after this Court directed its entry.

The trial court's verdict set forth alternative and contingent equitable and monetary awards for Appellees.  Specifically, it provided that if Wife paid Appellees the amount she had received from PMRS prior to the verdict within sixty days, and faithfully complied with the trial court's order to transfer future benefit payments, then the award of $503,656.51 (representing the total value of payments Wife would receive if she lived to her statistical life expectancy) would not be subject to recording or enforcement by Appellees. The verdict also placed upon Jeffrey Benyo the duty to reimburse Wife for any tax liability she realized by virtue of her receipt of the PMRS payments.

Wife's death after this appeal was filed mooted the primary, equitable form of relief awarded by the trial court.  Also, the record before us contains

no information about the parties' compliance with the duties imposed by the trial court, how those duties were impacted by Wife's filing for bankruptcy, or how much money Wife received from PMRS before her death terminated the annuity benefits. Even without those complicating factors, it is clear to us from the conditional nature of the relief awarded in the verdict that additional judicial fact-finding must occur prior to entry of a money judgment against Wife.

Accordingly, although Wife has presented this Court with no basis to disturb the trial court's verdict, we vacate the April 18, 2018 judgment entered on that verdict and remand for the trial court to calculate the full and final monetary relief due to Appellees and to enter judgment against Wife's estate for that amount.

Judgment vacated. Verdict affirmed. Case remanded with instructions. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/13/19